**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**UNITED STATES OF AMERICA, and
THE STATE OF COLORADO,
<u>ex</u> <u>rel.</u> TIMOTHY SANDERS,**
Plaintiffs,

v.

**UNIVERSITY OF COLORADO HEALTH, a Colorado non-profit corporation;
UNIVERSITY OF COLORADO HOSPITAL AUTHORITY, a body corporate and
political subdivision of the State of Colorado;
UCH-MHS, a Colorado non-profit corporation; and
DANIEL C. RIEBER, an individual**
Defendants.

---

***QUI TAM* COMPLAINT AND JURY DEMAND**

---

The Relator, Timothy Sanders, by and through his counsel, acting as a Relator on behalf

of the United States of America and the State of Colorado, states the following Complaint

against the Defendants:

**I.    <u>INTRODUCTION</u>**

1.    This lawsuit is brought pursuant to the provisions of the federal False Claim Act

["FCA"], 31 U.S.C. § 3729, *et. seq.*, to recover monies which the United States paid and/or did

not recover because of the Defendants' actions.

2.    This *qui tam* suit arises out of illegal schemes by Defendants to knowingly

submit, or cause to be submitted, false claims or statements to certain government healthcare

programs regarding the provision of emergency department healthcare services.

3.    This action alleges that the Defendants falsely billed emergency room and

emergency department evaluation and management ("E/M") CPT facility codes by improperly

upcoding these facility codes.  Where an appropriate emergency department E/M facility code for a given patient visit should have been a level 2 (99282), level 3 (99283) or level 4 (99284), the Defendants were billing a level 5 (99285).

4.      While the Defendants had adopted the American College of Emergency Physicians ("ACEP") ED Facility Level Coding Guidelines for determining the correct E/M CPT facility code to apply to a given patient's emergency visit, the Defendants developed and employed an automated billing system that systematically violated the ACEP standards and attributed level 5 status to emergency visits that were not ACEP qualified level 5 visits, and that otherwise did not qualify as level 5 visits per CMS' directives for determining the correct CPT facility code.

5.      The Defendants' automated billing system incorrectly billed a given patient's emergency visit as a level 5 visit if the number of times a patient's vitals were checked exceeded the number of hours a patient was seen in the emergency room or department. So, for example, if a patient's vitals were taken twice yet the emergency visit lasted less than two hours, the patient's visit would automatically be billed as a level 5 visit regardless of the patient's condition or the complexity of the visit. And, regardless of whether the visit satisfied the ACEP or CMS standards for a level 5 visit.

6.      The Defendants own and operate a large network of freestanding emergency rooms and hospital based emergency departments in the State of Colorado that operate under the "UCHealth" trademark or tradename.  These UCHealth emergency rooms or departments provide emergency services to a large volume of patients on a daily basis.  Each and every one of those patient visits is run through the Defendants' automated billing system described above.

7.  The Relator Timothy Sanders ("Sanders"), who is a Certified Coding Specialist, was employed by UCHealth as a Revenue Recovery Auditor.  In this capacity, Sanders resolved complaints from disgruntled patients who believed they had been overcharged by a UCHealth facility.   Sanders learned early in the course of his employment that the UCHealth's automated billing system was incorrectly charging emergency patients.

8.  When Sanders inquired about this issue, he was advised everyone in his team knew that the automated system was falsely billing certain patient visits as level 5.  Sanders was further told that the issue had been vetted all the way to UCHealth's Chief Financial Officer, who at the time was Defendant Daniel C. Rieber ("Rieber").  Sanders was told that UCHealth's management, including the CFO, had instructed the UCHealth staff to keep this automated billing system in place.

9.  Sanders further learned that UCHealth had not taken, and did not intend to take, any proactive measures to screen or audit the emergency room or department bills. Rather, what Sanders learned was that UCHealth would reduce an emergency services bill if a patient complained, but otherwise UCHealth would take no steps to make sure a given emergency services bill was correct.

10.  Over an approximate two month period, Sanders resolved 64 patient complaints where the automated billing system had charged the patient's emergency visit as a level 5 visit simply because the number of times the patient's vitals had been checked exceeded the number of hours the patient was in the emergency room or department. Sanders resolved these complaints by reviewing the patient's chart and properly applying the ACEP standards.  In 100% of these 64 cases, Sanders reduced the patient's charge from a level 5 visit to either a level 2, 3 or 4 visit.

11.     Sanders was employed at UCHealth from September 21, 2020 to November 11, 2020.  While so employed, Sanders inquired how long UCHealth had been employing this automated billing system that incorrectly billed emergency visits.  Sanders believes he was advised by fellow employee Frieda Vind that this system had been in place for approximately three years, so the system had been employed since approximately 2017.  Discovery will establish the date this system was implemented.

## II.     PARTIES

12.     Relator Sanders is a resident of Arvada, Colorado.

13.     The Defendant University of Colorado Health is a Colorado non-profit corporation that maintains its principal place of business at 12401 East 17th Ave., Aurora, CO 80045.  University of Colorado Health was formed on July 1, 2012 as a joint operating company between the University of Colorado Hospital Authority and Poudre Valley Health.

14.     Since at least December 7, 2015, University of Colorado Health has done business as "UCHealth."  University of Colorado Health has the exclusive rights to use the tradename and trademark "UCHealth."  University of Colorado Health will be referred to herein as "UCHealth."

15.     The Defendant University of Colorado Hospital Authority ("the Authority") was created in 1991 by the Colorado General Assembly.  The Authority was specifically designated as a body corporate and a political subdivision of the State of Colorado.  C.R.S. § 23-21-503(1).  This statute specifically provides that the Authority is not an agency of the State of Colorado and the Authority is not subject to the administrative direction or control of the regents of the University of Colorado or of any other department, commission, board, bureau or agency of the state.

16.     The Defendant UCH-MHS is a Colorado non-profit corporation that maintains its principal place of business at 1400 E. Boulder Street, Colorado Springs, CO 80909.

17.     The Defendant Daniel C. Rieber ("Rieber") is an adult individual who has been at all times material hereto a Vice President of, and the Chief Financial Officer for, UCHealth.

18.     At all times material hereto, the corporate defendants, including the Authority, acted by and through their officers, directors, employees and/or agents and are, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

19.     The individual defendant, Rieber, is being sued in his individual or personal capacity as opposed to his official capacity. Rieber had a clearly established statutory, regulatory and contractual duty to truthfully charge government healthcare programs for healthcare services.    Rieber's actions complained of herein violated clearly established statutory and contractual duties of which a reasonable person would have known.

20.     As is alleged herein, Rieber knowingly presented or caused to be presented a false or fraudulent claim for payment to the government in violation of 31 U.S.C. § 3729(a)(1)(A); knowingly made, used or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B); and knowingly made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

### III.    JURISDICTION AND VENUE

21.    This action is brought on behalf of the United States Government under 31 U.S.C. § 3729, *et seq*., the FCA.  Sanders brings this action under 31 U.S.C. § 3730(b) to recover for "false claims" which the Defendants knowingly presented, or caused to be presented, to the Government and/or concealed, or caused to be concealed, from the Government in violation of 31 U.S.C. § 3729(1)(A)-(B), (G) as amended May 20, 2009. This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

22.    *In personam* jurisdiction is appropriate in this district because the FCA provides for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant inquiry is whether a given defendant has sufficient contacts with the United States as a whole. *Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996). The Defendants have significant presence in Colorado and have abundant national contacts.

23.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found or transact business in this district and/or because one or more of the acts proscribed by the False Claims Act occurred within this district.

24.    Neither the Authority nor UCHealth, as a joint operating company partially owned by the Authority, are entitled to immunity from suit in this Court pursuant to the Eleventh Amendment.  Neither the Authority nor UCHealth is "an arm of the state" of Colorado.

25.    The Authority and, by relation UCHealth, are autonomous from the State of Colorado.  The Authority is specifically not an agency of the State of Colorado.  Rather it is a body corporate and political subdivision. Further, by statutory definition it is not subject to any

guidance, direction or control from the state. The Authority is governed by its own board of directors. C.R.S. § 23-21-503.

26.     The Authority and, by relation UCHealth, are financially independent from the State of Colorado. The Authority holds and owns its own assets, is authorized to sue and be sued, is authorized to issue bonds and generates and retains its own revenues.

## IV.     THE FALSE CLAIMS ACTS

### A.  The federal False Claims Act:

27.     The False Claims Act ("FCA") is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States.  See S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted in 1986 U.S.C.C.A.N 5266.

28.     The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153 and in 2009, and 2010, to enhance the ability of the Government to recover losses it sustained as the result of its payment of false claims.

29.     The FCA provides in pertinent part that any person who:

(A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

> Government, or knowingly conceals or knowingly and improperly avoids or decreases an
>
> obligation to pay or transmit money or property to the Government;

is liable to the United States Government for a civil penalty of not less than $5,500 and not more

than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3

times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(1).  See also 28 C.F.R. § 85.3(a)(9) (setting forth the current civil penalties

level of not less than $5,500 and not more than $11,000 for violations of the FCA).  For

violations occurring on or after November 2, 2015, and for a penalty assessed after June 19,

2020, the civil penalty amounts range from a minimum of $11,665 to a maximum of $22,331. 28

C.F.R. § 85.5.

30.     The terms "knowing" and "knowingly," which comprise the FCA's scienter

element, are defined at 31 U.S.C. § 3729(b)(1)(A) to mean a person who, with respect to relevant

information:

> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

31.     The FCA also broadly defines a "claim" as one that includes "any request or

demand, whether under a contract or otherwise, for money or property and whether or not the

United States has title to the money or property, that—(i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money

or property is to be spent or used on the Government's behalf or to advance a Government

program or interest, and if the United States Government—(i) provides or has provided any

portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

32.     The FCA empowers private persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.

33.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

### B.  The Colorado Medicaid False Claims Act:

34.     Colorado's false claims act is largely patterned after the federal FCA.

35.     Like the federal FCA, the Colorado Medicaid False Claims Act imposes liability on any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" or who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"  Colo. Rev. Stat. 25.5-4-305(1)(a)-(b), (f).

36.     The Colorado Medicaid False Claims Act provides for treble damages and penalties consistent with the federal FCA and requires complaints to be filed under seal without service on the defendants. Colo. Rev. Stat. 25.5-4-305(1) and 25.5-4-306(2)(b).

## V.    THE GOVERNMENT HEALTHCARE PROGRAMS AND THE PROVISION OF EMERGENCY ROOM SERVICES

37.    The term "government healthcare programs" or "GHPs" refers to healthcare programs paid for, in whole or in part, by federal or state funds.  They include:

### A.   The Medicare Part B program and its provision of emergency room services:

38.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A. Medicare is a 100% federally subsidized health insurance system.

39.    The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is part of HHS and is directly responsible for the administration of the Medicare program.

40.    CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as Medicare Administrative Contractors ("MAC's").  MAC's determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS.  See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

41.    Federal regulations impose a duty on a provider of services, such as UCHealth, to refund to the Government any funds the provider receives to which it is not entitled.   Such overpayments must be reported and returned within 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due.  Any overpayment retained by a provider after the deadline for reporting and returning it is an "obligation" as defined by the FCA. 42 U.S.C. § 1320a-7k(d).

42.     Statutory interest must be paid with respect to improperly retained overpayments. 42 U.S.C. § 1395ddd(f).

43.     Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

44.     The Medicare program consists of four parts: A, B, C, and D. Medicare Part B (Medical Insurance) helps pay for medically necessary services.

45.     Emergency department services are covered by Medicare Part B.

46.     For such emergency department services, the Medicare beneficiary pays a copayment for each emergency department visit.

**B. Tricare**

47.     TRICARE is a medical benefits program established by federal law. 10 U.S.C. § 1071-1110b.

48.     Formerly known as CHAMPUS, TRICARE is administered by the Defense Health Agency ("DHA"), a component of the Department of Defense ("DOD"). TRICARE provides health care benefits to eligible beneficiaries, who include, among others, active duty military personnel, retired service members, and military dependents.

49.     TRICARE is a "health care benefit program" as defined by 18 U.S.C. § 24(b), that affects commerce, and as that term is used in 18 U.S.C. § 1347. 3.

50.     TRICARE is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), that affects commerce, and as that term is used in 42 U.S.C. § 1320a-7b(b).

51.     TRICARE covers emergency care to include professional and institutional charges and services and supplies that are ordered or administered in an emergency department.

52.     The TRICARE regulations define "appropriate" medical care as that which is,
*inter alia*, "[f]urnished economically"—i.e., "in the least expensive level of care or medical
environment adequate to provide the required medical care." 32 C.F.R. § 199.2.

53.     Fraud or abuse by a provider may result in the denial of the provider's claims or
the exclusion or suspension of the provider from participation in the TRICARE program. 32
C.F.R. § 199.9(b), (c), (f).

### C. Other Federal Government Healthcare Programs

54.     The Federal Government administers other healthcare programs including, but not
limited to CHAMPVA, the federal workers compensation program, Indian Health Services, and
The Federal Employee Health Benefit program.

55.     CHAMPVA administered by the United States Department of Veterans Affairs is
a healthcare program for families of veterans with 100 percent service-connected disability. 31
U.S.C. §§ 1781 *et seq.*; 38 C.F.R. § 17.270(a).

### D. Colorado Medicaid:

56.     The Social Security Act provides entitlement to medical services for individuals
who meet eligibility requirements.  Title XVIII governs the Medicare Program.  Title XIX
establishes the State Option Medical Assistance Program, also known as Health First Colorado.
The Colorado Medical Assistance Act, C.R.S. 25.5.-4-101, provides the legal authority for the
Health First Colorado program.

57.     The Health First Colorado program is a state and federal partnership funded by
the State of Colorado and federal matching dollars.  State funds are appropriated through the
Colorado Legislature.  Federal funding is dependent upon compliance with federal guidelines.

58.    By statute, Health First Colorado pays for covered health care benefits for eligible

members.  The Health First Colorado program is an entitlement program, which means that any

person who meets the eligibility criteria is entitled to receive any medically necessary service

covered by the program.

59.    Health First Colorado uses CMS's Healthcare Common Procedural Coding

System ("HCPCS") to identify services provided to Health First Colorado members.  The

HCPCS includes codes identified in the Physician's Current Procedural Terminology ("CPT")

and codes developed by CMS.

60.    Health First Colorado provides for the necessary emergency department visits of

its members.

## VI.  THE CPT FACILITY CODES AT ISSUE IN THIS CASE:

61.    The gravamen of this case is that the Defendants knowingly and falsely employed

incorrect emergency department CPT facility codes to falsely bill GHPs.  The Defendants'

practice involved upcoding the appropriate CPT codes.

62.    The emergency department CPT codes at issue are facility codes 99281-99285.

63.    A part of the Federal Balanced Budget Act of 1997 required the Health Care

Financing Administration (now CMS) to create a new Medicare "Outpatient Prospective

Payment System" ("OPPS") for hospital outpatient services; analogous to the Medicare

prospective payment system for hospital inpatients known as "Diagnosis Related Groups" or

DRG's.

64.    CMS requires hospitals providing emergency department services to report those

services using Healthcare Common Procedure Coding System ("HCPCS") codes.  HCPCS

includes the American Medical Association's "Current Procedural Terminology," 4th Edition,

(CPT-4) for physician services and CMS developed codes for nonphysician services.   The

HCPCS codes are required for all outpatient hospital services unless specifically excepted in

manual instructions. Medicare Claims Processing Manual, Chapter 4- Part B Hospital, § 20.1.

    65.    CMS has not developed a national set of guidelines for facility-specific codes.

CMS has instructed providers to apply their own internal guidelines to existing CPT codes.

CMS has instructed the providers that each hospital's internal guidelines should follow the intent

of the CPT code descriptors, in that the guidelines should be designed to reasonably relate the

intensity of the hospital's resources to the different levels of effort represented by the codes.

Hospitals should ensure that their guidelines accurately reflect resource distinctions between the

five levels of codes. *Id.*, § 160.

    66.    In its 2008 OPPS Final Rules, found in the Federal Register, Vol. 72, No. 227,

pages 66579-67226, specifically page 66805, CMS identified eleven principles with which it

expected a given hospital's internal guidelines to comport:

> 1. The coding guidelines should follow the intent of the CPT® code descriptor in that the guidelines should be designed to reasonably relate the intensity of hospital resources required to the different levels of effort represented by the code.
>
> 2. The coding guidelines should be based on hospital facility resources.  The guidelines should not be based on physician resources.
>
> 3. The coding guidelines should be clear to facilitate accurate payments and be usable for compliance purposes and audits.
>
> 4. The coding guidelines should meet the HIPPA requirements.
>
> 5. The coding guidelines should only require documentation that is clinically necessary for patient care.
>
> 6. The coding guidelines should not facilitate upcoding or gaming.
>
> 7. The coding guidelines should be written or recorded, well-documented, and provide the basis for selection of a specific code.

8. The coding guidelines should be applied consistently across patients in the clinic or emergency department to which they apply.

9. The coding guidelines should not change with great frequency.

10. The coding guidelines should be readily available for fiscal intermediary or MAC review.

11. The coding guidelines should result in coding decisions that can be verified by other hospital staff, as well as by outside sources.

67.    With respect to the first principle, CMS stated that: "We note that the first principle states that coding guidelines should follow the *intent* of the CPT code descriptor to relate the intensity of resources to different levels of effort represented by the code, not that the hospital's guidelines need to specifically consider the three factors included in the CPT E/M codes for consideration regarding physician visit reporting." *Id.* p. 66806.

68.    A brief discussion of the intent of these E/M CPT codes as they were intended to apply to physician services is helpful to understand what CMS meant by the first principle.

69.    CPT Codes 99212 through 99215 are part of a code scheme that provides for the billing of evaluation and management (E/M) services by a broad range of health care providers providing physician services. Codes 99212-99215 apply to the provision of E/M services to established patients in an office or other outpatient setting.

70.    The determination of which code applies to a given level of E/M services is driven by predominantly four factors: history, exam, medical decision making and the amount of time.  For the codes 99212-99215, two of the three categories of history, exam and/or medical decision making must be satisfied. This relationship is illustrated by the following chart:

| Code | History | Exam | Medical Decision Making | Time |
|------|---------|------|-------------------------|------|

| 99212- Estb. Patient Level 2 | Problem focused | Problem focused | Straightforward | 10 min |
|---|---|---|---|---|
| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| **99215- Estb. Patient Level 5** | **Comprehensive** | **Comprehensive** | **High complexity** | **40 min** |

71.     With respect to the "History" component, for a physician to determine that a given episode qualified as a Level 5 session, the physician was required to extensively document that a comprehensive history had been obtained from the patient taking into account a thorough history of the illness, a complete review of the patient's systems and a complete review of the patient's past, family and/or social history as represented by the following chart:

| History of present illness (HPI) | Review of systems (ROS) | Past, family and/or social history (PFSH) | Type of history |
|---|---|---|---|
| Brief | N/a | N/a | Problem focused |
| Brief | Problem pertinent | N/a | Expanded problem focused |
| Extended | Extended | Pertinent | Detailed |
| **Extended** | **Complete** | **Complete** | **Comprehensive** |

72.     With respect to the "Exam" component, the physician also had to complete a comprehensive examination of the patient, which entailed a general multi-system examination or a complete examination of a single organ system. CMS 1995 Documentation Guidelines for Evaluation and Management Services, at E/M guidelines at p. 9.

https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/95Docguidelines.pdf. ("1995 CMS E/M Guidelines).

73.     And, with respect to the "Medical Decision Making" component, the physician had to engage in high complexity medical decision making.  Medical Decision Making refers to the complexity of establishing a diagnosis and/or selecting a management option as measured by:

a.   The number of possible diagnosis and/or the number of management options that must be considered;

b.   The amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyzed; and

c.   The risk of significant complications, morbidity, and/or mortality, as well as comorbidities associated with the patient's presenting problem(s), the diagnostic procedure(s) and/or the possible management options.

CMS 1995 E/M Guidelines at p. 11.

74.     The following chart shows the progression of the elements required for each level of medical decision making.  To qualify for a given type of medical decision making, two of the three elements in the table must be met or exceeded:

| Number of diagnoses or management options | Amount and/or complexity of data to be reviewed | Risk of complications and/or morbidity or mortality | Type of decision making |
|---|---|---|---|
| Minimal | Minimal or none | Minimal | Straightforward |
| Limited | Limited | Low | Low complexity |
| Multiple | Moderate | Moderate | Moderate complexity |
| **Extensive** | **Extensive** | **High** | **High complexity** |

CMS 1995 E/M Guidelines at p. 11.

75.     So in order for a physician to engage in high complexity medical decision making, the physician had to deal with a complex case that involved two of either: (1) extremely

complex diagnoses or management options; (2) extensive review of data and medical records;
and/or (3) a high risk of complications resulting in mortality.

76.     With that level of intent in mind with respect to the physician CPT E/M codes,
several organizations developed standards for implementation of these CPT E/M codes with
respect to hospital emergency department services. One of those organizations is the American
College of Emergency Physicians ("ACEP").  ACEP developed a set of guidelines titled "ED
Facility Level Coding Guidelines."  The ACEP Guidelines may be found online at:
https://www.acep.org/administration/reimbursement/ed-facility-level-coding-guidelines.

77.     The Defendants expressly adopted the ACEP Guidelines as their complete,
operative, internal guidelines for determining the appropriate CPT facility code to bill for
emergency department services.

78.     ACEP explains in its guidelines that the ACEP facility coding model provides an
easy to use methodology for assigning visit levels in an emergency department. There are three
columns in the guidelines. The far left column indicates the facility codes and corresponding
APC levels which are justified by the "Possible Interventions" listed in the middle column. The
far right column labeled "Potential Symptoms/Examples which Support the Interventions" is
used as an aid to the coder in determining which interventions most likely correspond with a
given facility code/APC level.  ACEP Guidelines at p. 2.

79.     This far right column of "Potential Symptoms/Examples" is not to be used to
determine the appropriate facility code/APC level. *Id.*

80.     The determination of the appropriate facility code/APC level is based solely on
the "Possible Interventions" listed in the middle column. The **"Possible Interventions"** refer to
interventions on the part of the nursing and ancillary staff in the emergency department and not

18

to interventions by the emergency physicians. **"Possible Interventions"** include some procedure

examples which might be billed separately by the facility. The procedures listed serve as a proxy,

qualifying the typical intensity of facility services provided for patients requiring them. Such

procedure examples are not intended to substitute for or duplicate labor, time or supplies

included in separately billable procedures. *Id.*

81.     Levels of **"Discharge Instructions"** are defined in the last section of these

guidelines. *Id.,* at p. 4.

82.     The appropriate facility code/APC level is determined by the interventions of

nursing and ancillary staff as listed in the middle column marked "Possible Interventions". If a

given "Possible Intervention" is listed in a section assigned to a specific facility code level, and if

no other interventions are provided that fall into a higher facility code level, then the facility

code level corresponding to that specific "Possible Intervention" is selected as the appropriate

"facility code/APC level". *Id.,* at p. 2.

83.     Within a given facility code/APC level, there may be multiple "Possible

Interventions" provided, all of which fall into the same facility code/APC level. Whether there is

a single "Possible Intervention" or multiple "Possible Interventions"-all of which fall into the

same facility code/APC level-the appropriate facility code/APC level to be assigned remains the

same. In other words, whether only a single "Possible Intervention" listed at a given facility code

level is present or if multiple or all "Possible Interventions" assigned to that facility code level

are present-the facility code/APC level is still the same. *Id.*

84.     For CPT code 99281, ACEP lists the following possible interventions:

- Initial Assessment
- No medication or treatments
- Rx refill only, asymptomatic
- Note for Work or School

- Wound recheck
- Booster or follow up immunization, no acute injury
- Dressing changes (uncomplicated)
- Suture removal (uncomplicated)
- Discussion of Discharge
- Instructions (Straightforward)

ACEP Guidelines at p. 5.

85.    For CPT code 99282, ACEP lists the following possible interventions:

- Could include interventions from previous levels, plus any of:
- Tests by ED Staff (Urine dip, stool hemoccult, Accucheck or Dextrostix)
- Visual Acuity (Snellen)
- Obtain clean catch urine
- Apply ace wrap or sling
- Prep or assist w/ procedures such as: minor laceration repair, I&D of simple abscess, etc.
- Discussion of Discharge Instructions (Simple)

*Id.*

86.    For CPT code 99283, ACEP lists the following possible interventions:

- Could include interventions from previous levels, plus any of:
- Receipt of EMS/Ambulance patient
- Heparin/saline lock
- Nebulizer treatment
- Preparation for lab tests described in CPT (80048-87999 codes)
- Preparation for EKG
- Preparation for plain X-rays of only 1 area (hand, shoulder, pelvis, etc.)
- Prescription medications administered PO
- Foley catheters; In & Out caths
- C-Spine precautions
- Fluorescein stain
- Emesis/ Incontinence care
- Prep or assist w/procedures such as: joint aspiration/injection, simple fracture care etc.
- Mental Health-anxious, simple treatment
- Routine psych medical clearance
- Limited social worker intervention
- Post mortem care
- Direct Admit via ED
- Discussion of Discharge Instructions (Moderate Complexity)

*Id.*

87.     For CPT code 99284, ACEP lists the following possible interventions:

- Could include interventions from previous levels, plus any of:
- Preparation for 2 diagnostic tests: (Labs, EKG, X-ray)
- Prep for plain X-ray (multiple body areas):
- C-spine & foot, shoulder & pelvis
- Prep for special imaging study (CT, MRI, Ultrasound,VQ scans)
- Cardiac Monitoring (2) Nebulizer treatments
- Port-a-cath venous access
- Administration and Monitoring of infusions or parenteral medications (IV, IM, IO, SC) NG/PEG
- Tube Placement/Replacement Multiple reassessments
- Prep or assist w/procedures such as: eye irrigation with Morgan lens, bladder irrigation with 3-way foley, pelvic exam, etc.
- Sexual Assault Exam w/ out specimen collection Psychotic patient; not suicidal
- Discussion of Discharge Instructions (Complex)

*Id.,* at p. 6.

88.     For CPT code 99285, ACEP lists the following possible interventions:

- Could include interventions from previous levels, plus any of:
- Requires frequent monitoring of multiple vital signs (ie. 0 sat, BP, cardiac rhythm, respiratory rate)
- Preparation for ≥ 3 diagnostic tests: (Labs, EKG, X-ray)
- Prep for special imaging study (CT, MRI, Ultrasound, VQ scan) combined with multiple tests or parenteral medication or oral or IV contrast.
- Administration of Blood Transfusion/Blood Products Oxygen via face mask or NRB Multiple Nebulizer Treatments: (3) or more (if nebulizer is continuous, each 20 minute period is considered treatment)
- Moderate Sedation
- Prep or assist with procedures such as: central line insertion, gastric lavage, LP, paracentesis, etc.
- Cooling or heating blanket
- Extended Social Worker intervention
- Sexual Assault Exam w/ specimen collection by ED staff
- Coordination of hospital admission/ transfer or change in living situation or site
- Physical/Chemical Restraints
- Suicide Watch
- Critical Care less than 30 minutes

*Id.,* at p. 7.

89.    For CPT code 99285, ACEP lists the following potential symptoms and examples

which support the interventions:

- Blunt/ penetrating trauma requiring multiple diagnostic tests
- Systemic multi-system medical emergency requiring multiple diagnostics
- Severe infections requiring IV/IM antibiotics
- Uncontrolled DM
- Severe burns
- Hypothermia
- New-onset altered mental status
- Headache (severe): CT and/or LP
- Chest Pain—multiple diagnostic tests/treatments
- Respiratory illness--relieved by (3) or more nebulizer treatments
- Abdominal Pain—multiple diagnostic tests/treatments
- Major musculoskeletal injury
- Acute peripheral vascular compromise of extremities
- Neurologic symptoms -multiple diagnostic tests/treatments
- Toxic ingestions
- Mental health problem - suicidal/homicidal

*Id.*

90.    ACEP's definition of the discharge instructions are as follows:

a. **Straightforward:** Self-limited condition with no meds or home treatment
   required, signs and symptoms of wound infection explained, return to ED if
   problems develop;

b. **Simple:** OTC medications or treatment, simple dressing changes; patient
   demonstrates understanding quickly and easily;

c. **Moderate:** Head injury instructions, crutch training, bending, lifting, weight-
   bearing limitations, prescription medication with review of side effects and
   potential adverse reactions; patient may have questions, but otherwise
   demonstrates adequate understanding of instructions either verbally or by
   demonstration; and

d. **Complex:** Multiple prescription medications and/or home therapies with
   review of side effects and potential adverse reactions; diabetic, seizure or
   asthma teaching in compromised or non-compliant patients; patient/caregiver

may demonstrate difficulty understanding instructions and may require additional directions to support compliance with prescribed treatment.

*Id.,* at p.4.

## VII. THE DEFENDANTS' DUTY TO UNDERSTAND THE LAW

91.    Those who deal with the federal government, and in particular, those who seek compensation from the federal government, must use due care to ensure that when they request payment from the government they are legally entitled to receive that compensation. Every person who deals with the federal government is presumed to know the law.  *See, e.g., Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 609, 112 L. Ed. 2d 617 (1991); *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); *United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997).

92.    Failure to adequately familiarize oneself with the legal requirements for government compensation is evidence of reckless disregard. *See United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001).

93.    Furthermore, when an individual or entity is confused by the legal requirements of a regulation, it has "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). The unique circumstances of each case dictate the extent of the duty to inquire. *Id.*

VIII.        **THE IMPROPER CONDUCT OF THE DEFENDANTS**

A. **Background regarding the Defendants' interest in the subject emergency
departments:**

94.        UCHealth provides administrative services for all freestanding emergency rooms

and hospital based emergency departments using the UCHealth trademark or tradename.

95.        In April of 2015, UCHealth entered into a for profit partnership with Adeptus

Health to develop emergency care facilities in Denver, Colorado Springs and northern Colorado

including twelve existing First Choice emergency rooms along with two new ones.

96.        In December of 2017, following Adeptus Health's bankruptcy filing, UCHealth

acquired seventeen freestanding emergency rooms and 2 hospitals from the previous Adeptus

partnership.

97.        Subsequently, UCHealth transferred ownership of these freestanding emergency

rooms to either the Authority or to UCH-MHS.

98.        For example, the Authority has owned, or presently does own, the following

freestanding emergency rooms and has operated them or does operate them under the tradenames

designated below:

     a.   UCHealth Emergency Room- Arvada;

     b.   UCHealth Emergency Room – Arvada West;

     c.   UCHealth Emergency Room – Aurora Central;

     d.   UCHealth Emergency Room – Aurora Smoky Hill;

     e.   UCHealth Emergency Room- Commerce City;

     f.   UCHealth Emergency Room- Green Valley Ranch;

     g.   UCHealth Emergency Room – Highlands Ranch;

     h.   UCHealth Emergency Room – Littleton;

24

     i.  UCHealth Emergency Room- Parker;

     j.  UCHealth Emergency Room- Thornton; and

     k.  UCHealth Emergency Room- Thornton 120th.

99.    Similarly, UCH-MHS has owned, or presently does own, the following freestanding emergency rooms and has operated them or does operate them under the tradenames designated below:

     a.  UCHealth Emergency Room- Fountain;

     b.  UCHealth Emergency Room- Meadowgrass;

     c.  UCHealth Emergency Room- Powers; and

     d.  UCHealth Emergency Room- Woodmen.

100.    With respect to Colorado hospitals using the UCHealth trademark or tradename, such as UCHealth Broomfield Hospital or UCHealth Grandview Hospital, these UCHealth hospitals were originally established as individual domestic limited liability corporations and then converted in approximately 2018 into individual domestic nonprofit corporations.

101.    Upon information and belief, the individual corporations established to own these Colorado hospitals using the UCHealth trademark or tradename are owned by UCHealth, the Authority or UCH-MHS.

102.    UCHealth provides the billing services, which includes presenting the bills to all GHPs for payment, and ensuring the accuracy of those bills, for all freestanding emergency rooms and all hospital based emergency departments using the UCHealth trademark or tradename, including the emergency rooms identified in ¶¶ 98 and 99 above and all emergency departments located in hospitals using the UCHealth trademark or tradename.

103.    Consequently, UCHealth provides billing services to a large network of freestanding emergency rooms and hospital based emergency departments that operate under the UCHealth trademark or tradename.  These UCHealth emergency rooms or departments provide emergency services to a large volume of patients on a daily basis.  Many of these patients are beneficiary of GHPs, including Medicare, TRICARE and Medicaid.

104.    Each and every one of the patient visits at these freestanding emergency rooms and hospital based emergency departments that operate under the UCHealth trademark or tradename are run through the UCHealth automated billing system complained of herein.

105.    The owners of the various freestanding emergency rooms and hospital based emergency department using the UCHealth trademark or tradename, are vicariously responsible for the acts and omissions of UCHealth as these owners designated UCHealth as their agent or designee to fulfill their obligation to GHPs to truthfully and accurately bill the GHPs.

**B.  Relator Sanders' knowledge:**

106.    The allegations of the Defendants' improper conduct are based on the direct and independent knowledge of Relator Sanders.

107.    Relator Sanders was hired by UCHealth on September 21, 2020 in the capacity of a Revenue Recovery Auditor (RRA) working in the Revenue Integrity Department.

108.    Relator Sanders worked at UCHealth's central management office located at 7901 E. Lowry Blvd. Denver, CO.

109.    UCHealth's Revenue Integrity Department employed the individuals who were the experts within the UCHealth organization regarding the correct and accurate coding and billing of emergency department and urgent care services.

110.    At all times material hereto, Sanders understood that he was an employee of
UCHealth and everyone with whom he worked was employed by UCHealth.  However, the 2020
W-2 provided to Sanders for his work at UCHealth states that the Authority was his employer.

111.    In his capacity as a RRA, Relator Sanders dealt with patient complaints from all
freestanding emergency rooms or a hospital based emergency departments that operated under
the UCHealth trademark or tradename.  For simplicity purposes, those UCHealth freestanding
emergency rooms and hospital based emergency departments will be referred to as "EDs".

112.    Relator Sanders did not deal with the ED patients directly. UCHealth customer
service would route the patients' complaints to Sanders.  Sanders would then review a given
patient's bill and chart and confirm whether the correct ED CPT facility code had been billed for
the ED services provided to the patient.

113.    A frequent complaint that Sanders fielded was that the patient thought the level 5
(code 99285) bill he or she had received for his/her ED visit was excessive.  The patient
complaints were generally along the lines of "I was only there for an hour," "I was barely seen,"
"I was seen for a minor issue," or "my condition was not life threatening."

114.    Many of these patient complaints about being billed a level 5 visit concerned
patients whose vitals had been checked at least twice and whose complaint was categorized as
"vitals frequently monitored."

115.    The individual within the Revenue Integrity Department who trained Relator
Sanders was Frieda Vind ("Vind").  Vind was employed as a RIT Coding Educator/Revenue
Recovery Auditor within UCHealth's Revenue Integrity Department.

116.    Sanders was advised by Vind and others within the UCHealth Revenue Integrity
Department that UCHealth had adopted the ACEP standards as the complete UCHealth internal

guidelines for determining the correct E/M CPT facility code to be applied to a given emergency room or department visit.

117.     Vind had substantial knowledge regarding the ACEP standards and what was required for a given patient episode to qualify as a level 5 visit.

118.     In the course of resolving these "vitals frequently monitored" complaints, Sanders learned from Vind that UCHealth typically did not dispute that type of complaint and would reduce the ED CPT code billing level from a level 5 code to the appropriate lower level determined by the proper application of the ACEP standards.

119.     Vind explained that the operative ACEP term found within its description of 99285 possible interventions "requires frequent monitoring of multiple vital signs" required a doctor's order to take the vitals.

120.     Vind further explained that in her experience, the presence of a doctor's order was rarely seen in these cases where a patient had been billed at a level 5 because of the claim that their vitals had been frequently monitored.

121.     Sanders also understood from his knowledge of CPT facility codes that the associated CPT facility code for a level 5 billing, 99285, was intended to apply to complex ED visits.

122.     With respect to these "vitals frequently monitored" complaints, Sanders learned that UCHealth had intentionally set up its automated ED billing system to bill a level 5, 99285, emergency visit if the number of times a given patient's vitals had been checked exceeded the number of hours the patient had been seen in the ED, regardless of the complexity of the provided ED services.

123.    So, for example, if a patient's vitals were checked upon admission and discharge, so twice, yet the patient's ED visit lasted less than 2 hours, the ED visit would be automatically billed as a level 5 visit, regardless of the patient's condition, how simple or routine the ED care was or the intensity of the hospital resources that were employed.  The same concept applied if the patient's vitals were checked three times but the ED visit lasted less than three hours.

124.    It became clear to Sanders that this automated billing system was frequently overcharging patients at a false and excessive rate.

125.    Sanders voluntarily left UCHealth's employ on November 11, 2020.  Sanders primarily left because he was not comfortable with UCHealth's ethics.  Sanders returned to the employ of his former employer, Children's Hospital of Colorado.

126.    During the approximate two month period that Sanders worked for UCHealth, he fielded 64 of these "vitals frequently monitored" complaints.  In each instance, he reduced the ED charge from a level 5 to a level 2, 3 or 4.

127.    In none of these 64 cases was there a doctor's order requiring the frequent monitoring of the patient's vitals.  Also, none of the 64 cases otherwise had an intervention that met the ACEP standards for billing the episode as level 5.

128.    In making the determination of whether the ED visit should be billed as a level 2, 3 or 4, Sanders applied the ACEP ED Facility Level Coding Guidelines, as instructed by his superiors.  To the best of Sanders' knowledge, none of his decisions to reduce the charges in these 64 cases were modified or changed by anyone within the UCHealth organization.

129.    The dollar amount difference between a level 5 and a level 4 or level 3 is significant.  For example, with respect to Patient A, whose bill was adjusted down from a level 5

to a level 4, the bill was reduced from a charge of $6,121.62 to a charge of $4,531.26, a difference of $1,590.36.

130.    Similarly with respect to Patient B, whose bill was adjusted down from a level 5 to a level 3, the bill was reduced from a charge of $6,340.75 to a charge of $1,933.70, a difference of $4,407.05.

131.    Sanders was troubled by the "vitals frequently monitored" situation and inquired why the automated billing system had not been corrected. Sanders was advised that UCHealth was aware that the automated billing system falsely billed many UCHealth patients.  Sanders was further advised that UCHealth had vetted the issue and had decided to keep the system in place and only make an adjustment when a patient complained.

132.    In other words, UCHealth knowingly refused to make any proactive effort to change the system, or to review or audit bills for ED services, before they were presented to GHPs, to ensure that the use of the CPT code 99285 has been properly employed and the bill was accurate.

133.    Sanders inquired and learned that UCHealth's management was aware of the problem with its automated billing system and endorsed its continued use. For example, on Sanders' second day of employment, September 22, 2020, Sanders met with Vind, Sanders' boss, Adrienne Vigil ("Vigil") (System Manager, Revenue Integrity) and her boss, Ellen Schedel ("Schedel") (Senior Director Coding), in person and expressed his concern about this issue. Sanders was told by Schedel that UCHealth Compliance and UCHealth's CFO, who at the time was Rieber, were aware of the issue and had signed off on not changing the automated system.

134.    During this September 22, 2020 meeting with Vind, Vigil and Schedel none of these individuals advised Sanders that he was wrong, that the automated billing system was

actually correctly billing patients or provided any form of justification for the maintenance or accuracy of the system.  It is important to note in this respect that Schedel was the Senior Director of Coding, or in other words, the most authoritative individual within the UCHealth organization with respect to the proper and accurate coding of patients' bills.

135.    On September 23, 2020, Sanders brought the issue up again with Vind and asked if it would be appropriate to speak with UCHealth Compliance about this issue. Vind advised against it – she explained it would involve going over Schedel's head and that Vind had been present at a meeting with Compliance when this issue had been discussed, so Compliance already knew about the issue.

136.    Sanders brought up this issue a second time on September 25, 2020 with his boss Vigil. Vigil acknowledged the issue and Sanders and Vigil decided they would deal with it at a later time.

137.    On October 15, 2020, Sanders brought this issue up a third time with Nikolay Tzetkov and Katlyn Nail. Mr. Tzetkov is a Systems Analyst for the EPIC ASAP Emergency Departments and Urgent Cares.  Ms. Nail is a Systems Analyst Associate.  Sanders was told that this issue had been discussed with UCHealth's CFO and they were told to leave it as is.

138.    Therefore, UCHealth's management, including CFO Rieber, had been fully informed that false bills were being regularly submitted to all insurance carriers, which would include GHPs, yet they chose to take no action to correct the situation.

139.    With respect to the time frame in which UCHealth had been using this defective automated system, Sanders inquired how long UCHealth had been employing it and was advised by Vind that this system had been in place for approximately three years, so the system had been employed since approximately 2017.

C.  **Patient Examples:**

140.    The following patient examples provide evidence of the Defendants' knowingly false billing:

141.    **Patient A** was a 22 year old male who was seen at the UCHealth Emergency Care located at the Anschutz Medical Campus on June 27, 2020.  Patient A presented with complaints of body tenseness.  He had been treated at the AMC ED the day before and he was having a bad reaction with complaints of muscle rigidity and malaise. Patient A's vitals were checked twice, upon admission and at discharge. Because Patient A's vitals were checked twice, and the total time from admission to discharge was under two hours, he was automatically billed for a level 5, or CPT code 99285, ED visit.  Upon review, Relator Sanders reduced this charge from a level 5, 99285, to a level 4, 99284, noting that there had been administration and monitoring of parenteral medications, IV Benadryl.   This reduced the ED charge from $6,121.00 to $4,531.20.

142.    **Patient B** was a 19 year of female seen at the UCHealth Commerce City Emergency Room on August 24, 2020.  Patient B complained of an anxiety attack after leaving a domestic violence situation where police were involved.  Patient B had a history of anxiety but had normally been able to control it.  Patient B also complained of right lower quarter pain for one week and thought it was related to an ulcer.  Patient B's vitals were checked twice upon admission and at discharge.  Because Patient B's vitals were checked twice, and the total time from admission to discharge was under two hours, she was automatically billed for a level 5, or CPT code 99285, ED visit.  Upon review, Relator Sanders reduced this charge from a level 5, 99285 to a level 3, 99283, noting that there had been prescription medication administered PO, Lorazepam.   This reduced the charge from $6,340.75 to $1,933.70.

143.    **Patient C** was a 32 year old male who was seen at UCHealth Aurora Central Emergency Room on November 25, 2019.  Patient C complained of an abscess on his right buttock for the past four days.  Patient C's vitals were checked twice, upon admission and at discharge.   Because Patient C's vitals were checked twice, and the total time from admission to discharge was under two hours, he was automatically billed for a level 5, or CPT code 99285, ED visit.  Upon review, Relator Sanders reduced this charge from a level 5, 99285, to a level 3, 99283, noting that the discharge instructions were of moderate complexity because the medications Amoxicillin and Clavulanate were discussed.   This reduced the charge from $6,121.62 to $1,866.87.

144.    **Patient D** was a 32 year old male who was seen at the UCHealth Poudre Valley Hospital Emergency Care on June 30, 2020.   Patient D complained of a dog bite that resulted in lacerations to his left second and third fingers.  Patient D's vitals were checked twice, upon admission and at discharge. Because Patient D's vitals were checked twice, and the total time from admission to discharge was under two hours, he was automatically billed for a level 5, or CPT code 99285, ED visit.  Upon review, Relator Sanders reduced this charge from a level 5, 99285, to a level 3, 99283, noting that prescription medications, Amoxicillin and Clavulanate, were administered PO.   This reduced the charge from $2,755.36 to $959.97.

145.    **Patient E** was a 67 year old female seen at the UCHealth Littleton Emergency Room on February 15, 2020.  Patient E complained of burning and frequency with urination since the previous night.  Patient E's vitals were checked twice, upon admission and at discharge. Because Patient E's vitals were checked twice, and the total time from admission to discharge was under two hours, she was automatically billed for a level 5, or CPT code 99285, ED visit. Upon review, Relator Sanders reduced this charge from a level 5, 99285, to a level 3, 99283,

noting that the ED staff had prepared the patient for a lab test.   This reduced the charge from $6,121.62 to $1,866.87.

146.    **Patient F** was a 76 year old female seen at the UCHealth Thornton Emergency Room on April 18, 2020.  Patient F complained of bilateral ear pain and a sore throat. Patient F's vitals were checked twice, upon admission and at discharge. Because Patient F's vitals were checked twice, and the total time from admission to discharge was under two hours, she was automatically billed for a level 5, or CPT code 99285, ED visit.  Upon review, Relator Sanders reduced this charge from a level 5, 99285, to a level 3, 99283, noting that the ED staff administered prescription medication PO.   This reduced the charge from $6,121.62 to $1,866.87.

147.    These patient examples are not exclusive.  Additional patient examples exist, and the documentation with respect to more patient examples are in the possession of the Defendants and will be obtained through discovery.

148.    During the approximate two month time frame that Relator Sanders worked for the defendants, he fielded 64 complaints from disgruntled patients about the fact that they had been improperly charged Level 5 for the emergency department services the defendants provided based on the "vitals frequently monitored" standard. The following chart evidences the results of Relator Sanders's review of those patient complaints and his accurate application of the ACEP guidelines:

| # | Patient | Disch. Date | Patient Complaint | Originally Billed | Adjusted Bill |
|---|---|---|---|---|---|
| 1. | G | 11/28/19 | Freq. Vitals | Level 5 | Level 3 |
| 2. | H | 10/26/19 | Freq. Vitals | Level 5 | Level 4 |
| 3. | I | 12/2/19 | Freq. Vitals | Level 5 | Level 4 |
| 4. | J | 9/14/19 | Freq. Vitals | Level 5 | Level 3 |
| 5. | K | 10/21/19 | Freq. Vitals | Level 5 | Level 4 |
| 6. | L | 12/23/19 | Freq. Vitals | Level 5 | Level 3 |
| 7. | M | 10/12/19 | Freq. Vitals | Level 5 | Level 4 |
| 8. | N | 12/1/19 | Freq. Vitals | Level 5 | Level 4 |

| # | Patient | Disch. Date | Patient Complaint | Originally Billed | Adjusted Bill |
|---|---------|-------------|-------------------|-------------------|---------------|
| 9. | O | 11/27/19 | Freq. Vitals | Level 5 | Level 3 |
| 10. | P | 11/6/19 | Freq. Vitals | Level 5 | Level 3 |
| 11. | Q | 6/27/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 12. | R | 9/16/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 13. | S | 9/10/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 14. | T | 5/24/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 15. | U | 8/30/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 16. | V | 3/6/19 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 17. | W | 8/24/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 18. | X | 8/9/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 19. | Y | 6/26/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 20. | Z | 1/28/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 21. | AA | 3/2/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 22. | BB | 8/22/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 23. | CC | 8/1/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 24. | DD | 8/26/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 25. | EE | 9/14/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 26. | FF | 2/25/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 27. | GG | 6/10/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 28. | HH | 8/1/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 29. | II | 7/20/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 30. | JJ | 6/19/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 31. | KK | 7/24/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 32. | LL | 7/27/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 33. | MM | 8/25/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 34. | NN | 9/6/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |
| 35. | OO | 8/30/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 36. | PP | 6/25/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 37. | QQ | 8/2/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 38. | RR | 7/27/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 39. | SS | 2/15/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 40. | TT | 3/18/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 41. | UU | 7/23/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 42. | VV | 8/9/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 43. | WW | 6/19/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 44. | XX | 7/26/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 45. | YY | 3/22/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 46. | ZZ | 8/24/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 47. | AAA | 11/25/19 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 48. | BBB | 6/30/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 49. | CCC | 8/10/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 50. | DDD | 3/13/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 51. | EEE | 4/18/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |

| # | Patient | Disch. Date | Patient Complaint | Originally Billed | Adjusted Bill |
|---|---|---|---|---|---|
| 52. | FFF | 7/20/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 53. | GGG | 5/6/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 54. | HHH | 6/14/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 55. | III | 3/5/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 56. | JJJ | 8/5/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 57. | KKK | 8/8/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 58. | LLL | 12/10/19 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 59. | MMM | 4/7/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 60. | NNN | 7/17/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 61. | OOO | 7/26/20 | Vitals Freq. Monitoring | Level 5 | Level 4 |
| 62. | PPP | 8/8/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 63. | QQQ | 1/11/20 | Vitals Freq. Monitoring | Level 5 | Level 3 |
| 64. | RRR | 7/1/20 | Vitals Freq. Monitoring | Level 5 | Level 2 |

149.    In summary, of the 64 improper level 5 ED visit charges documented above, when Relator Sanders properly applied the Defendants' internal guidelines, 7 were adjusted to a level 2 charge, 29 were reduced to a level 3 charge and 28 were changed to a level 4 charge. None of the 64 level 5 charges were deemed justifiable by Relator Sanders.

**D. Conclusions:**

150.    The Defendants knowingly employed, or caused to be employed, a knowingly defective automated billing system that falsely billed GHPs for all or a portion of a patient's emergency room or department visit.

151.    This defective automated billing system was employed across a large network of UCHealth ED facilities.

152.    This defective automated billing system was employed with respect to a large volume of GHP beneficiaries on a daily basis.

153.    This defective automated billing system knowingly failed to accurately capture the ACEP standards, which UCHealth had adopted as its internal guidelines.  Instead, the

automated billing system was regarded by UCHealth's own experts as a system that routinely violated the ACEP standards and falsely billed UCHealth ED patients.

154.    And, over and above the automated billing system's failure to accurately apply the ACEP standards, it also caused the emergency services bills UCHealth presented to GHPs to be in violation of a number of the principles which CMS established, including principles 1, 2, 3, 6, 7 and 8.  See ¶ 66, supra.

155.    In other words, the fact that a patient's vitals were checked at admission and discharge, which appears to be driven more by hospital policy than the seriousness of the patient's condition, does not accurately capture the intensity of the hospital's resources that were necessary to attend to the patient.  Attributing a level 5 charge to a patient who has an anxiety attack (Patient B), an abscess (Patient C), a minor dog bite (Patient D) or an urinary tract infection (Patient E) and whose vitals are otherwise unremarkable violates the clear letter and intent of the CMS principles.

156.    The Defendants' billing system caused emergency room or department visits that properly should have been qualified as either level 2, 3 or 4 visits to be presented to GHPs as level 5 visits.

157.    The Defendants' billing system caused bills to be transmitted to GHPs that were false when measured by either the standards established by the ACEP Guidelines or as measured by CMS' directives that hospitals should adopt internal guidelines that followed the intent of the CPT code descriptors as well as the eleven principles CMS articulated in its 2008 OPPS Final Rules.

158.    The Defendants' actions were clearly "knowingly false."  A diligent understanding of the applicable regulations and billing requirements of the GHPs would have led any reasonable person to understand that the bills UCHealth presented to GHPs were false.

159.    Moreover, the overall circumstances, including the manner in which UCHealth ignored the notice and complaints it received from its employees regarding the extensive falsity of the ED bills generated by this automated billing system, coupled with the fact that UCHealth refused to correct this system and refused to audit the emergency services bills generated by this system, demonstrates that the Defendants' actions were made with actual knowledge of their falsity, were submitted with deliberate ignorance of the truth or falsity of their accuracy and/or were submitted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(B).

160.    And, these false submissions were also "material."  If the responsible individuals with authority within the government had been aware of the Defendants' fraudulent scheme underlying the submitted patient bills, the government would not have paid these bills. At a minimum, knowledge by the responsible government individuals with authority of the Defendants' false claims would have had a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

### IX.    FIRST CLAIM FOR RELIEF
### FCA LIABILITY, 31 U.S.C. § 3729(a)(1)(A)-(B), (G)

161.    The Relator incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

162.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 – 3733.

163.    On or about January 2017 and continuing until the present and beyond, the Defendants, individually and by and through the entities they own and control, including UCHealth, knowingly presented, or caused to be presented, one or more false or fraudulent claim for payment or approval.

164.    The submission of these false claims was knowingly false as defined by the FCA.

165.    The submission of these false claims was material as defined by the FCA.

166.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

167.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

168.    By virtue of the acts described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) by failing to refund the fraudulently obtained federal crop insurance benefits they received.

169.    Relators cannot now identify all of the false claims for payment that Defendants presented or caused to be presented, or the false records or statements Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of the records in Defendants' or third parties' possession.

170.    The United States, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

171.    The United States, unaware that Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the government, did not collect from Defendants monies that it would have collected but for Defendants' unlawful conduct.

172.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

173.    Additionally, the United States is entitled to treble damages and to the maximum penalty under 31 U.S.C. §3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

### X. SECOND CLAIM FOR RELIEF – COLORADO MEDICAID FALSE CLAIMS ACT C.R.S. § 25.5-4-305(1)(a)-(b), (f)

174.    The Relator incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

175.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5 – 25.5-4-310.

176.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the State of Colorado, in violation of Colo. Rev. Stat. 25.5-4-305(1)(a).

177.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of Colo. Rev. Stat. 25.5-4-305(1)(b).

178.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or

transmit money or property to the state or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. 25.5-4-305(1)(f).

179.     Relators cannot now identify all of the false claims for payment that Defendants presented or caused to be presented, or the false records or statements Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of records in Defendants' or third parties' possession.

180.     The State of Colorado, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay claims that would not be paid but for Defendant's illegal conduct.

181.     The State of Colorado, unaware that Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, did not collect from the Defendants monies that it would have collected but for Defendants' illegal conduct.

182.     Defendants have damaged, and continue to damage, the State of Colorado in a substantial amount to be determined at trial.

183.     Additionally, pursuant to Colo. Rev. Stat. 25.5-4-305(1), the State of Colorado is entitled to treble damages and the maximum penalty under the Colorado Medicaid Statute, as adjusted, for each and every violation alleged herein.

## XII.    PRAYER FOR RELIEF

WHEREFORE, the Relator, Timothy Sanders, on behalf of the United States and the State of Colorado, requests: (a) that the United States Government and the State of Colorado recover from the Defendants all sums which they improvidently paid as a result of the Defendants' actions, or which the Defendants failed to refund to these governments, including interest thereon; (b) that the damages described in (a) be trebled as provided in 31 U.S.C. § 3729(a) and C.R.S. § 25.5-4-305(1); (c) that the maximum civil penalty be assessed against the Defendants for each false claim, record or statement submitted directly or indirectly to the Government as a result of its wrongful actions; (d) that the Court award the Relator all amounts as are permitted under 31 U.S.C. § 3730(d) and C.R.S. § 25.5-4-306, including an appropriate share of any sums recovered and benefits obtained in this action, now or in the future, along with the Relator's reasonable expenses, attorney fees, and costs incurred herein; and (e) that the Court grant any additional appropriate relief with respect to this *qui tam* action.

**THE RELATOR DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Wednesday, April 28, 2021.

THE LAW FIRM OF MICHAEL S. PORTER LLC

By:      s/ Michael S. Porter
Michael S. Porter, Esq.
4350 Wadsworth Blvd., Suite 300
Wheat Ridge, CO  80033
Telephone:  (303) 940-8370
Fax:     (720) 512-4918
E-mail: porterlaw@comcast.net

**ATTORNEY FOR THE RELATOR
TIMOTHY SANDERS**

Relator's address:
6705 Youngfield Court
Arvada, CO 80004